Pierce D. CAREY, Plaintiff,

v.

Robert H. FINCH, Secretary of Health, Education, and Welfare, Administrator of the Security Administration, Defendant.

Civ. A. No. 70–75.

United States District Court,
E. D. Louisiana,
New Orleans Division.

July 15, 1970.

Richard L. Voelker, Jr., New Orleans, La., for plaintiff.

Robert O. Homes, James D. Carriere, Asst. U. S. Attys., for defendant.

RUBIN, District Judge.

At the heart of this case is the question of the validity of a regulation adopted by the Secretary of Health, Education and Welfare.

Sections 1801 through 1901 of The Social Security Act contain the "Medicare" provisions. 42 U.S.C. § 1395 *et seq.* Payment for services furnished an individual may be made only to those providers of services that have established their eligibility. 42 U.S.C. § 1395f.[1]

But "payments shall also be made to any hospital for in-patient hospital services furnished * * * to an individual entitled to hospital insurance benefits * * * even though such hospital does not have an agreement in effect under this subchapter if (A) such services were emergency services * * *." 42 U.S.C. § 1395f(d) (1).

Pursuant to his statutory authority, 42 U.S.C. § 1395hh,[2] the Secretary of HEW has adopted regulations defining emergency services.[3] One part of these regulations reads:

"Existence of medical necessity for emergency services is based on the physician's assessment of the patient prior to admission to the hospital.

1. Section 1395cc sets out the requirements which hospitals must meet in order to be "providers of services" under § 1395f. The basic requirement of § 1395cc is that the hospital have an agreement in effect with the Secretary of Health, Education and Welfare.

2. "The Secretary [of HEW] shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter."

3. Section 405.152(b), published in 20 CFR § 405 *et seq.*, defines emergency services as follows:

"For purposes of the hospital insurance benefits program, 'emergency services' are those inpatient services * * * which are necessary to prevent the death

*Therefore, conditions developing after a non emergent admission are not considered emergency services for purposes of this subparagraph."* Section 405.191(c).

There is no dispute about any of the material facts. During the month of May, 1968, Mrs. Amelia B. Fourticq, who was then 81 years old, was preparing to take a trip from New Orleans to San Antonio when she felt pains in her right leg. She consulted and was treated by Dr. Solomon Winokur, who referred her to Dr. Robin Hardy for X-rays. Both Dr. Winokur and Dr. Hardy diagnosed the pain in her right leg and hip area as arthritis and she was treated by Dr. Winokur almost daily for two weeks.

Since her pain continued, Dr. Lloyd C. Eyrich was consulted on June 4, 1968. He examined Mrs. Fourticq at home and recommended that she be sent to a hospital for X-rays, to determine what treatment should be administered. An application for admittance to Southern Baptist Hospital was made immediately, but no bed was available for Mrs. Fourticq for nine days thereafter. She was finally admitted to Southern Baptist Hospital on June 13, 1968, for the purpose of taking X-rays of her leg and performing other minor diagnostic tests. Southern Baptist was not then participating in the Medicare program and Mrs. Fourticq knew this when she sought to be admitted.

Although taken to the hospital in an ambulance, Mrs. Fourticq was feeling fine. X-rays were taken the day she arrived at the hospital, but they failed to show anything wrong with her hip. The next day Dr. James Lenoir, an orthopedist, was consulted. He recommended that further X-rays be taken in the area of the knee, instead of solely in the hip. Because of the severe pain which had developed after the initial X-rays, Mrs. Fourticq could not be moved, and X-ray equipment was brought in to her room to examine the lower portion of her leg. At that time, it was discovered that the bone had been practically eaten away by cancer and, while additional X-ray pictures were being taken, the bone broke.

An immediate operation was necessary to repair the fracture. Consideration was given to transferring Mrs. Fourticq to a hospital participating in the Medicare program but the doctors felt she could not be moved. The operation was performed on June 14, 1968. On July 17, 1968, at 11:15 P.M., Mrs. Fourticq died, without ever having left Southern Baptist Hospital.

In this action, Mrs. Fourticq's son-in-law seeks to recover benefits for expenses incurred by the hospitalization of Mrs. Fourticq at the Southern Baptist Hospital from June 14, 1968 to July 18, 1968. The hearing examiner recommended that the claim be allowed, but the HEW Appeals Council reversed his decision on the ground that Mrs. Fourticq's hospitalization was not for "emergency services."

Both parties now move for summary judgment. Since the statute stipulates, "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive," 42 U.S.C. § 405(g),[4] this court's review is restricted to the question whether the Appeals Council's decision is supported by substantial evidence. Knox v. Finch, 5 Cir. 1970, 427 F.2d 919; Burdett v. Finch, 5 Cir. 1970, 425 F.2d 687; Martin v. Finch, 5 Cir. 1969, 415 F.2d 793;

---

or serious impairment of the health of the individual, and which, because of the threat to the life or health of the individual, necessitate the use of the most accessible hospital (see Section 405.192) available and equipped to furnish such services * * *."

Section 405.192 establishes the rules for determining whether or not services are furnished by the most accessible hospital available and equipped to furnish such services. In addition, this section provides further interpretation by the Secretary of the meaning of the term "emergency services."

4. 42 U.S.C. § 1395ii makes this section applicable to administrative decisions under the Medicare Act, through reference to 42 U.S.C. § 405(h).

Labee v. Cohen, 5 Cir. 1969, 408 F.2d 998; Celebrezze v. O'Brient, 5 Cir. 1963, 323 F.2d 989; McGaughy v. Gardner, E.D.La.1967, 264 F.Supp. 820.

■ Based on an examination of the record, which includes a transcript of the proceedings before the hearing examiner, it is my conclusion that the Appeals Council did have substantial evidence on which to base its decision in this case. Actually, there is no dispute as to the *facts* surrounding Mrs. Fourticq's condition when she entered Southern Baptist Hospital; the controversy centers on whether the Appeals Council used an appropriate standard, under the Medicare statute, in denying plaintiff's claim on these facts.

The hearing examiner decided that "the written and oral evidence indicates that an emergency situation existed at the time [Mrs. Fourticq] was admitted and continued until she was discharged." But the hearing examiner applied the wrong criterion: he looked to Mrs. Fourticq's condition in fact, not to her physician's assessment at the time.

There is no doubt that, when Mrs. Fourticq was admitted to Southern Baptist Hospital, her physician viewed her condition as non emergent. At that time the physician responsible for treating her considered that her health permitted her, without undue danger, to wait nine days for admission for diagnostic tests. She was not thought to require emergency care. The claimant in effect concedes that, at the time of admission, no emergency existed, because he does not claim benefits for the day of June 13, when Mrs. Fourticq was admitted to the hospital. Rather, the claim for emergency care payments is made only for the period beginning June 14, when her hip broke.

Claimant stresses that the cancer that led to her death did not "develop" after Mrs. Fourticq was admitted to the hospital but had existed for some time before. This is of course correct. But the broken hip, which required the emergency operation, did not exist when Mrs. Fourticq was admitted. It was literally a condition that developed after her admission.

Plaintiff's counsel suggested in oral argument that the fact that the bone fracture was unexpected, and that it unquestionably required immediate treatment, should control. He analogized Mrs. Fourticq's situation to that of a person who happens to suffer injury immediately outside a non-participating hospital, or in the lobby after having been discharged for unrelated treatment. Those are the types of emergency situations that the statutory exception appears precisely intended to cover; actually, the regulation was designed to distinguish those events from the type of emergency that arose in the instant case. For here, the emergent condition for which Mrs. Fourticq required extensive medical attention arose *after* her admission, not before. Indeed, it was directly related to and a consequence of the condition that led her to seek hospitalization originally. Any medical treatment that requires hospitalization, regardless of how minor it may appear initially, can result in an emergency situation: serious hemorrhaging may occur during a tonsillectomy, a patient having his wart removed may experience adverse reactions to even a local anesthetic, and a gastro-intestinal X-ray series may reveal unsuspected serious conditions. This is, of course, even more likely where the patients are all elderly. The Medicare regulation is reasonable in distinguishing between the patient's active selection of a hospital, in the face of the possibility that more care may be needed than anticipated, and the accident of geography that causes an individual to require sudden emergency care in the vicinity of a non-participating hospital.

Nor does the fact that Mrs. Fourticq was suffering from a serious condition unknown to her physicians before she

entered the hospital change the result. The test adopted by the regulations is based entirely on the physician's assessment of his patient prior to the admission. If the doctor thinks the condition is an emergency, the fact that his concern is later proved unfounded does not deprive the patient of benefits. Obversely, if he considers the patient's condition is not emergent, the fact that he learns of more serious ailments after hospitalization does not render the hospital admission itself retroactively emergent. The test adopted by the regulations is predicated on the doctor's diagnosis prior to admission, an entirely reasonable standard. Nor is it inappropriate to emphasize, even at the expense of redundancy, that the crucial diagnosis is made by the patient's own attending physician, not someone in the government's employ.

■■ As remedial social welfare legislation, "the Social Security Act is to be construed liberally to effectuate its general purpose of easing the insecurity of life," Rodriguez v. Celebrezze, 1 Cir. 1965, 349 F.2d 494, 496. See also, e. g., Rasmussen v. Gardner, 10 Cir. 1967, 374 F.2d 589, 594; Walston v. Gardner, 6 Cir. 1967, 381 F.2d 580, 585; Celebrezze v. Kilborn, 5 Cir. 1963, 322 F.2d 166, 168. But that does not mean the court must declare any regulation that leads to a denial of benefits to be invalid. Regulation § 405.191(c) makes the existence or nonexistence of an emergency condition depend on the assessment contemporaneously made by the person who was then best qualified to make it, the patient's physician. This standard is, in the main, probably more generous to claimants than other criteria would be. At any rate, it is reasonable and fairly comports with the statute.

For these reasons, plaintiff's motion for summary judgment will be denied, and judgment will be entered for defendant, affirming the decision of the Appeals Council.